It's carded now in session. Please be seated. Thank you. Will the clerk please call the next case? 323-0083, Law Offices of Charles Chejfec, LLC, Appellant by Charles Chejfec v. Mark Franz and the Village of Glen Allen, Appellee by Michael Kujawa. Mr. Chejfec, is it? Yes. Okay, you may proceed. May it please the court, my name is Charles Chejfec and I represent the appellant in this case. I'd like to reserve five minutes for rebuttal. Thank you. There is one issue before the court in this case and hopefully it's a simple, straightforward issue. And that's whether the First Amendment complaint stated a claim for tortious interference with contractual relations. The law in this area, in Illinois, is well settled. As recently as 1989, the Illinois Supreme Court has set forth the elements of a claim for tortious interference with contractual relations as follows. And this comes from the HPI Healthcare Services case. It's the only time the Illinois Supreme Court has ever announced the elements of this cause of action. The first element is, one, the existence of a valid and enforceable contract between the plaintiff and another. Two, the defendant's awareness of this contractual relationship. Three, the defendant's intentional and unjustified inducement of a breach of the contract. Four, a subsequent breach by the other caused by the wrongful conduct. And five, damages. This particular district, the third district, when I was researching my appellate brief, I located 11 cases that also set out the elements of tortious interference with contractual relations. And they follow these five elements almost verbatim. There's no meaningful difference between them. Would the Supreme Court follow up? They certainly took guidance from the appellate court when they issued their decision in HPI Healthcare. In any event, the trial court focused on element two when the plaintiffs filed their 2615 motion to dismiss. And there, the trial court found that in addition to pleading the defendant's awareness of the contract, the plaintiff was also required to plead that the defendants were aware of the discrete contractual terms in the contract that were allegedly breached. And I can tell you that in the transcript, the lower court had said, and this is at page record 64, and this is a quote, The difficulty is the complaint doesn't indicate that the village or friends knew of the terms of the lease. They might have been aware that there was a lease, but they really weren't aware of the terms of the lease. The court then went on to say, Were these defendants knowledgeable of the terms of the lease? Because that's really what's being alleged, that they interfered with the tenant's right to try to purchase the property that was basically contained in the terms of the lease. There's nothing pled here to show that friends in the village knew about those terms. Now, I had attempted to point out to the trial court that the law that I just read you about the Illinois Supreme Court never holding, no appellate court in Illinois has ever held, that in addition to pleading a defendant's awareness of a contract, that the defendant also had to be aware of discrete contractual terms that were allegedly breached. And the judge addressed that, and he said, and this is at record 68, The Illinois Supreme Court, I'm sorry, it says, The answer goes to say, The Illinois Supreme Court has never held a plaintiff must show more than a defendant's awareness of a contractual relation to survive a 2615 attack. And he says, I think that's an incorrect statement of law. I would respectfully submit to this court that the trial court erred when it said that and reached that holding for essentially three reasons. First, as I said before, and I've said in my briefs, there has never been a case anywhere in Illinois, let alone the Illinois Supreme Court, where the trial court has essentially engrafted a sixth element into pleading a cause of action. And the trial court was required not only to follow the Illinois Supreme Court under the principle of stare decisis when applying the elements of this claim, but also the third district cases that hold the same. And the reason that you don't have to, or a plaintiff doesn't have to, plead that the defendant knew of the discrete contractual terms that were allegedly abreached is because courts look at the tort of tortious interference with contract or tortious interference with economic advantage as a property right. And they're concerned with, the cause of action is concerned with protecting that property right as a whole. It doesn't focus on individual terms or conditions within that contract. And Justice Albrecht, you actually wrote about this recently, last month, in a case called Graco v. Bill Walsh. There you were discussing the differences between tortious interference with contract and tortious interference with prospective business relations. And you said there, and I quote, a contractual relation is sacrosanct and takes precedent over the conflicting rights of any presumptive inferior, including his or her right to compete and his or her own prospective advantage. And then you went on to say, the tort recognizes that a person's business relationships constitutes a property interest and as such are entitled to protection from unjustified tampering by another. And the significance of that is that the tort really isn't concerned about, well, did they breach Provision 4 or Provision 5 or Provision 6? The tort is more concerned with protecting your property right in your contractual relationships. And in this case, I had a contractual relationship, and my law office did, with the owner of the building to either buy it from them if they were going to sell it, I would have the right of first refusal to negotiate in good faith, or if they weren't willing to sell it to me, I would have the right to good faith exclusive negotiations to extend my lease. And so you can't have, the underlying purpose of this tort, it doesn't, it's inconsistent with what the trial court ruled when it held that you have to be aware of discrete contractual terms and you have to plead that. So I would submit that that was wrong and error as a matter of law. The second reason why I would respectfully submit that the court erred is because the court's ruling would effectively either minimize or eliminate a cause of action for tortious interference with contractual relations when that contract is an oral contract. This court has recognized that you can tortiously interfere with an oral contract. If a party has to be, if a defendant has to be aware of contractual terms, and in this case the judge talked about them reading it, then you could never have tortious interference with an oral contract because there isn't a contract to read. There isn't a contract to review. There isn't a term in there that would be something a defendant would get notice of. And if I could, I'd like to give you an example of what I'm talking about. Let's say, for example, Judge Holdridge, you own a landscape company and you've contracted with my neighbor to cut their grass from April to October once a week for the summer. And you're going to pay that person $20 to do it every time they come once a week, and your contract's exclusive with that company. I happen to live next door to the person that you have a contract with, and I too have a landscaping company,  I walk over to my neighbor and I say, I'd like to cut your grass. And you answer, well, I have a contract with someone else. And I said, that's okay. Whatever you're paying them, I'll take $5 less. That's what I say to the neighbor, and the neighbor says, deal. Now, I don't know what the contract terms are that you pay $20 or that you get paid $20. I don't know that it's an exclusive contract. I don't know how long it's for. Do I escape liability because I wasn't aware of those specific contractual terms? No. You have a property interest in your contractual relationship with my neighbor to cut their grass. I was aware of it when the neighbor told me, and I went ahead and said, I'll do it for $5 less. I've induced a breach. I can't benefit from my own ignorance about the contract when I'm made aware that a relationship exists, and I managed to induce a breach by saying, well, I'll do it for $5 less. There's no law that would protect me from that. But that's essentially what the trial court ruled when he said that these defendants have to have knowledge of the discrete contractual terms. The third point I'd like to make, and why I believe from a policy perspective this can't be the law, is because cases would most likely turn on the subjective belief of the defendant who's being accused of tortiously interfering. What do I mean by that? Well, if the trial court is correct that the defendant has to be aware of these discrete contractual terms that are being breached, then the defendant also has to understand what those terms are, and that understanding has to be the same as the contracting parties. Because if it isn't, the defendant could come in and say, well, yeah, I saw the contract, and I saw the terms, but I concluded on my own that it wasn't enforceable. So I couldn't have intended to induce a breach because I didn't think the contract was enforceable. And even if the contract was enforceable, the defendant's own subjective belief now becomes the key issue in the case, and there's no element in there that talks about that or allows the defendant to be able to have the case turn on their own subjective belief. So the ruling of the trial court is not only inconsistent, respectfully, with what the case law is and what the cases have held in terms of setting out the elements, but it also undermines the policies that exist for this cause of action existing. I would also submit that even if the law is as the trial court thought it was, that the First Amendment complaint still pleads facts to show that the defendants were aware of the contract and that the terms, that they were on inquiry notice of those terms, and they chose to essentially engage in willful blindness so that they had the benefit of saying, well, yeah, we knew there was a contract, but it's the plaintiff's fault because the plaintiff never sent us the contract. That's something that they've argued in their response brief. Well, I can tell you that, and I'm going to walk you through briefly the facts of this, that the defendants knew well in advance of their negotiations with the third and crescent, their co-defendant, that I had a contract in the lease on the property. And the first time they learned of that was in November of 2020 when I had a conversation with the Village of Glen Ellum attorney over a sign dispute on the property. I had just moved in. There was an old sign on the property that I wanted to use to hang my shingle, if you will, on it, and the village had sent a letter to the office addressed to me. I don't know how they got my name. It was intended for the owner, so I opened it, and they were claiming that the sign was in violation of the municipal code and it wasn't grandfathered in. So because I wanted to use the sign and I was an attorney and I had a relationship with Mr. Matthews, the village attorney, because we'd worked on cases before, I told the owner, I'll handle it. And so from November all the way to December, I had multiple conversations, emails, text messages with Mr. Matthews, the village attorney, and during those conversations, he was aware of my practice prior. We had discussed this fact that I was renting the property and that I said I'm leasing it and that's why I'm calling about the sign and I'd like to resolve this with you because I intend on being here and renewing my lease. So in November of 2020, the village, through the village attorney, and the documents that were exchanged, letters, and Mr. Franz was on one of those letters, knew that I had a lease on the property. Now flash forward to May of 2022. That's when the third and crescent, the co-defendant, had contacted me May 2nd and asked if I'd be interested in buying the property, and I said I would. And in that conversation, we agreed on a purchase price of $550,000. And I told him that I needed to do my due diligence, but that he was not too consistent with our contract to market the property or negotiate with anyone else, and he said fine. It wasn't six hours later that he sent an email to the village, now having me given a price, to see if the village wanted to buy the property  And so they then, T&C, third and crescent, began to negotiate with the village, and it culminated on May 16th. While I was doing my due diligence, inspecting the property, getting my financing in order, May 16th, the third and crescent, the owner, sent a contract over to the village, an offer to buy the property. And that offer had in it a provision that said all leases cannot be renewed and a number of other things. That prompted Greg Matthews, and by the way, I know all this because I issued a FOIA request and got all their internal communications. Mr. Matthews said to Mr. Franz, are there leases on this property? If there are, inquire about them. So Mr. Franz inquired to third and crescent about the existence of leases, and they had responded, yes, there's a lease. So they knew May 16th, as early as May 16th, that I was leasing the property. Your time is up, but you will have time in reply. Thank you. Mr. Kujawa? Kujawa. Kujawa? Kujawa.  You may respond. Thank you. Good morning, Your Honors. May it please the Court and Counsel. Michael Kujawa on behalf of the defendants and appellees, the Village of Glen Ellyn, and the Village Manager, Mark Franz. I will agree with a few things that Counsel just set up here. This is a pretty straightforward, simple case, and I think the law is clear. And I don't believe that we are asking this Court to do anything other than uphold the law. What do you understand the law to be? Well, it's the HPI services, five elements that need to be alleged, with facts. It's just like the 11th and 3rd District cases that were cited in the briefs. That agreed with the five elements for tortious interference with a contractual relation. What the lower court did, and what this Court should do, is agree that there were not enough facts pled to support those five elements. In particular, Counsel focused on the second element, defendants' awareness of this contractual relation. And I think the key word there is not just aware of a contract, it's being aware of the contractual relation, which implies that you have to know that there is something about a contract that exists that your behavior might be inducing someone else to breach for this particular tort to have effect. And I think the most important element that the lower court focused on is the third element, defendants' intentional and unjustified inducement of a breach of contract. Because that's where, despite this being a very lengthy First Amendment complaint with many exhibits attached to it, the facts, actual facts, that are contained within the complaint are rather sparse. It is full of conclusions and some conspiracy theories, but the actual facts as to what happened once the village and Mr. Franz found out about the existence of this contract and what they did clearly does not support the element of defendants' intentional inducement of a breach of contract. In fact, the facts show the exact opposite, which is why the lower court agreed that Plaintiff had not pled facts sufficient to support a cause of action for tortious interference with contractual relations. And if we just focus in on the timeline here, counsel talked about, well, he had a conversation with Village Attorney Matthews a year and a half or longer prior to any discussion of the sale of this particular piece of property. And he mentioned that he had a lease in the property. Well, there are no terms as far as what that lease was. Was it a month-to-month? Was it a year lease? Was it a multiple-year lease? What were the facts that were given to Village Attorney Matthews, which might put the village on notice of this particular lease? And certainly, even if he said it was a year or whatever the length of the term was, he mentions that he told Attorney Matthews he intended to renew the lease for some time period in the future, but even that is not fact-specific enough to put Attorney Matthews or Glen Ellen on notice of what this lease is, because this lease is different than other leases that existed in the building at the time. Mr. Shafak's law firm wasn't the only tenant in this building. This is a commercial building. There was another person who had a month-to-month lease in that building. There were specific terms in this lease which were unusual and unique to the contractual relation between the T&C, the building owner, and the Shafak law office. And that is the paragraphs 19 and 5. Paragraph 19 is the exclusive right to negotiate for the purchase, first right to purchase, if you will, of the property. So really this issue here, you're using lease, both sides are using lease, you're talking about provisions in the lease. Yes. The lease has a tenancy right, correct? Yes. And this lease has a provision for purchase, correct? And for continued negotiations or an extension of the lease. There were two specific provisions in Mr. Shafak's lease that the village was not aware of. So we're talking about tenancy in the presence, renewal right, and purchase right. Is that what this lease is? Let's get to the chase here. Yes, certainly. And I don't even know that there was nothing about the tenancy right that we did. Anything that we did, the village, Mr. Franz, Mr. Matthews, had anything to do with Plaintiff's tenancy rights. He stayed in that building up until his lease expired on August 31st of 2022. And then he did not renew the lease and he moved out. The question becomes, how can the village or Mark Franz intentionally induce breach by T&C if they don't know what the terms are that would cause something to happen? And the plaintiff began his negotiations early on in May 16th of 2022 in terms of the communication between T&C and Mr. Shafak about the purchase of the building. It was not until June 1st that the village first learned of any of these specific provisions within the contract. And that only came from a cease-and-desist letter that Mr. Shafak sent to the village. Now, Mr. Shafak knew on May 24th, a week prior to sending a cease-and-desist letter, that Glenn Allen had apparently made a counteroffer and there was negotiations ongoing between T&C and the village. He waited a week to send a cease-and-desist letter, and even then did not provide a copy of the contract. But this is the first time that the village has put on notice. And what does the village do? They immediately reach out to T&C and ask some questions. What is going on here with this lease and these specific provisions, which apparently give this person rights above and beyond what any other normal lease you would think would include, including these month-to-month leases that you told us might exist. And then, it wasn't until June 3rd that Glenn Allen and Mark Franz actually got a copy of the lease. And then, within three days, they requested that T&C cancel the contract. And that's documented in both the complaint, June 6th of 2022, that Glenn Allen tells T&C, you need to cancel this contract. You have issues that you need to work out with your tenant, with these specific provisions of this lease, and we're not getting involved in that. You work that out. And on June 7th, that's when Glenn Allen gets the letter from T&C canceling the contract. That is also documented in the village manager's notes to the village board. On June 20th, at their request, because there was an issue that they had no idea existed, up until they, one, got the cease and desist letter, but then they only got Mr. Shafetz's interpretation of what those lease provisions were. But on June 3rd, when they actually got a copy of the lease, and they saw what those provisions were, they canceled that contract. So, again, when we look at, there's no stare decisis issue here. Was there any discrepancy between Mr. Shafetz's, as you call it, presentation of the provisions and the contract itself? No, he actually adequately and accurately quoted the two provisions from the lease in his cease and desist letter. But we didn't have, the village did not have a copy of the lease at the time. And what they did when they got the cease and desist letter, without the copy of the lease, is they immediately contacted T&C and sent them a copy of the cease and desist letter and said, hey, what's going on here? Because this is not what you've been talking to us about. This is something completely new. We want to investigate this before we move forward. That is not the conduct of a party looking to induce breach of contract. That's a party looking to negotiations for a deal, thinking they have all the information, and learning that they don't, and taking a step back and saying, we're going to investigate this further before we do anything else. And that's exactly what they did. Even if you count June 1 as the date. But your position is that the village was thinking they were negotiating with someone who had the right to contract. Yes. And that's where we're not, nobody's asking for a sixth element to be worked into the five elements of tortious interference with contractual relationship. All we're asking for is that there are facts to support both that we had awareness of the contractual relation, not just a contract. There was a month-to-month tenant who had a residence in this particular building at the time that all this was going on. They don't have a breach of contract claim, nor do they have a tortious interference with contract. Am I correct also with regard to the one allegation that through these offhand conversations on a whole other issue that a plaintiff said, I'm on a lease in this new place, and the allegation is that, and I told him it was a one-year lease, an annual, not a month-to-month. But that lease would have ended in August of 22 anyway, a month, even if this thing had closed inappropriately, or in the villagers' eyes, appropriately. It wouldn't have been a problem for them anyway, because even if it's on a year, an annual, it would have been done about a month later, it would have been over later. Am I correct on that timeline? The lease provision, and I guess I'm, are you talking about the conversation regarding the sign? Yes. That's where he says, I think the plaintiff's position is, I told him that I was on an annual lease at that time. But even if that were true, that lease ended in August, like a month, it ended about a month after the closing, or within two months after the closing. So the villagers wouldn't, it would not have been, the villagers wouldn't think they were doing anything wrong. All right, he's there for the full year, we'll let him stay at the end of the lease, it'll only be a couple months after we close it anyway. I mean, they could, that's the same thing. It's even better than that, Your Honor, because the sign issue is in 2020. And that's in October of 2020. That lease that he was on would have expired in August of 2021. Okay. So now he did, in the allegations in the complaint and in his argument, he did say that he says, I told Matthews, it's my intent to renew the lease for another year. But not in contract terms. Yeah, but that's, you're talking still seven months down the line before that first lease even expires, to be renewed for another year, which would bring it into the time period when all this was taking place. And again, it's not as though anybody at the Village of Glen Ellyn, including Mr. Franz, had any idea about these specific provisions in there, the right of, first right to purchase, and this negotiation for a lease thereafter. So when you, when they finally get that, and even if you're going to say, well, you got it, when you, we, Mr. Shafick sent the cease and desist letter on June 1 of 2022. I still think that they have the obligation to look at the actual lease and make sure that it's been quoted correctly, and do their due diligence in this, what they're trying to do here, in terms of potentially purchasing property to build a park within the village. But even if we give them June 1, we requested that TNC cancel this lease on June 6, six days thereafter, which is still less than the time it took plaintiff, Mr. Shafick, to send his cease and desist letter after he knew that there had been some negotiations going on between TNC and the village. So the idea that we, in I would say three days, but even if we expand it to six days, that that time period that the village took and Mr. Franz took to investigate the situation, and then requested that that lease, that contract be canceled, because they did not want to get involved in the disputes between Mr. Shafick and TNC. They say that in the world of municipal law and contract negotiations, they actually got out of the thing in lightning speed and said, well. Exactly. These things don't happen at the drop of a hat or they don't turn on a dime. There are things that have to be done when you're talking about a municipal entity. And they did everything they could to back out of that particular contract once they learned of the terms. And plaintiff has, Mr. Shafick has all sorts of things in his First Amendment complaint. But the judgment joint focused on the exact issue that needs to be focused on here, which are what are the facts which would show that Mark Franz and the village of Glen Ellyn intended to induce TNC to breach that contract. And there are no facts based upon the timeline and the documentation that's contained in the First Amendment complaint. For those reasons, I would ask that this court affirm the ruling by the local courts and dismiss this case with the right to restate. Any questions? Thank you, counsel. Counsel, you may respond. I didn't have an opportunity to finish my presentation of the facts, which are going to be materially different than what you just heard. Even if you were to discard me expressly telling Mr. Matthews in November of 2020 that I intended to renew the lease, which I did for the entire duration of 2022, sorry, through August of 2022, there's no dispute that in May prior to or during the time that I was supposed to be negotiating exclusively with TNC, that the village became aware that there was a lease on the property. And that happened on May 16th. That's when the TNC sent over the offer saying, hey, we're not going to renew any leases that are on the property. And Franz then specifically asked TNC in an email, are there leases on this property? And they said, yes, there are. That was May 17th. Okay. And then Franz. Didn't TNC misrepresent that all the leases were monthly? From what I saw, they represented. You said it was in the contract. That's right. They said it's month to month, but there was a lease. That's the point. And that becomes important because if we're talking about discrete terms in a contract, and let's face it, it's not uncommon in a lease to have a right to buy, a first right of refusal, or a right to renew, then we should be talking about why the village, doing its due diligence, didn't say to them, hey, if there are leases on this property, tell us what they are. What are the terms? It's incumbent upon them to do that. And I cited in my reply brief a case called Reed, where the court says when you're dealing with the purchase of property, you're presumed to know everything about that property when you're buying it, and you're on inquiry notice to ask and to find out. And it actually becomes worse because they were talking about how I didn't allege intent to interfere with my contractual relationship, but Franz, in his counteroffer, handwrites on the offer that was sent to him by T&C, terminate all leases. So he was more than comfortable, the village was more than comfortable telling T&C as a condition of buying it, they have to terminate all the leases. They didn't even bother to look to see what the leases were. This is willful blindness or ignorance so that they have plausible deniability. And the fact is they knew about it on May 16th, May 17th that there was a lease. On May 25th, Franz sent over the offer and said, seller will not enter into or extend any leases with respect to the property from and after the date seller signs this contract without the express written consent of buyer. That was the language in the contract. And then on May 31st, they both signed. So when we talk about June 1st, what happened in June, the tort had already been completed. On May 31st, they had a contract. The next day, I send a cease and desist letter saying, here are the terms, stop doing this. Now, what happened after that's interesting because they then had, you can see scrambling. So are you saying that that tort back in May was tortious interference with your right to renew the lease? To buy the property and renew the lease. Gone that horse. We've ridden that horse. Now you're saying you had a right to renew. Yeah, I had a right to negotiate. So you're saying that tortious interference was interfering with your right to renew? My right to renew the lease or to negotiate in good faith to renew the lease and also to buy it because we'd already struck a deal to buy it. On May 2nd, we agreed on 550 and I just can't. Well, let's forget the buying now. I said that earlier. It would still be here. You'd still file the suit if there wasn't a right to purchase, but if there was an interference with your right to renew. Yes, that's correct because I've alleged both are breaches of the contract. That's count one against G&C, they're breaches of contract. So the tort was complete. And then I allege in the complaint, oh, my time, oh, it's almost up, but I allege in the complaint that this cancellation was really a, I don't want to use the word conspiracy, but they decided, look, this contract, as you said, Justice Peterson, is only going to extend through August. This was in June. So I had two months. They said, look, let's just cancel the contract. Go negotiate. I'll tell Chafick, which Matthews did, go negotiate with T&C. And I said, Greg, I'm happy to do that. Give me a letter that says you guys have no longer any interest in this property. He wouldn't do it, which is consistent with them still being interested in trying to induce the. How is that relevant? How is what? How is that relevant? As long as they don't break the law, they can be interested and wait. That's good advice. I mean, he can represent it. For the end of time, we will never be interested in this again. I would be bad at the lawyer. I would get him in trouble, I would think, with his bosses. It's good lawyering if they meant it, but they didn't. And the facts in the complaint allege all these objective specific facts. For example, when I vacated, when I went back to T&C and said, I'd like to buy it, they said, we're not selling it to anyone. And then I said, well, I'd like to renew the lease. And they said, we're not interested in renewing the lease. Because the village had offered these powerful inducements, $50,000 more, and they were giving T&C exclusive information and assistance with becoming the developer of this very profitable commercial property in Glenelg. And so those inducements are as powerful today as they were back then, because as I filed a motion, I just saw you ruled on it, you're taking it with the case. I foyed more documents from them in October. They started talking again about buying the property in June and in October. So they're continuing to try to do this. So that cancellation, I allege, was a sham, and I put in the brief and my complaint specific objective facts that are consistent with that. They weren't truly going to negotiate with me in good faith, and they didn't. They said, we're not going to sell you the property, and we're not even going to negotiate on the lease. So I got out in August. Okay, your time is up. Give me a little more time. Thank you, counsel. Thank you, counsel. Both your arguments. Let's hear some questions. Yes? Any questions? Both. Thank you, counsel. Thank you very much. Both for your arguments. This matter will be taken under advisement, and a written disposition shall issue.